# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION
## 3:17-cv-311-FDW

| | | |
|---|---|---|
| **WILLIE T. KELLY, JR.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **ORDER** |
| | ) | |
| **GEORGE T. SOLOMON, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| _____ | ) | |

**THIS MATTER** comes before the Court on Defendants' Motion for Summary Judgment, (Doc. No. 71), and on *pro se* Plaintiff's "Motion to Alter Amend the Judgment & Deposition Before Action or Pending Appeal & Rule 27 Motion to Strike [Doc. 62-63] Motion to Stay [Doc. 14, Doc. 42, Doc. 55-56, 60," (Doc. No. 66).

## I.     BACKGROUND

*Pro se* incarcerated Plaintiff's Amended Complaint, (Doc. No. 15), passed initial review on claims of the use of excessive force/failure to intervene against Defendants Codi Laur and Kevin Ingram, deliberate indifference to a serious medical need against Kenneth Beaver, Alan Deese, John Herring, Ingram, Jeffrey Krantz,[1] Chris Hatley,[2] Gregory Hayes[3] and Nurse William, and retaliation against Hayes, Ingram, Krantz, Hatley, Laur, Scott McFaulds, and Gregory Swink. See (Doc. No. 18). Summary judgment was previously granted in favor of Defendant Hayes, (Doc. Nos. 42, 59).

---

[1] Defendant "Kenz" in the Amended Complaint.
[2] Defendant "Hately" in the Amended Complaint.
[3] Defendant "Haynes" in the Amended Complaint.

**(1)** <u>**Amended Complaint**</u> (Doc. No. 15)

Plaintiff alleges that he uses a wheelchair and cane, that he needed hip replacement surgery that he ultimately received, and that his wrist was injured in 2013. On February 13, 2017, Defendants Herring and Beaver allowed Defendant Deese to take Plaintiff's doctor-ordered wheelchair when he had just come back from a bone specialist in Raleigh. Defendant Deese knew that Plaintiff's wheelchair was damaged on February 13, 2017 so that it would not roll straight. It was replaced on March 22, 2017. This inflicted emotional pain and increased pain.

On March 8, 2017, there was a violent incident between gang members in the housing dorm. Plaintiff commented that, if officers were where they supposed to be on the floor, these incidents would not happen. Defendant Ingram overheard Plaintiff's comment. Defendant Ingram took Plaintiff's cane and, when Plaintiff asked Defendant Laur to be cuffed in front, Laur hit Plaintiff so hard he pushed Plaintiff onto the bed and Plaintiff defecated himself. Defendants Ingram and Krantz escorted Plaintiff to segregation without a wheelchair or cane with his hands cuffed behind him while knowing his wrist had been injured in 2013. As a result, Plaintiff's hip gave out which reinjured him. Staff let go of Plaintiff while Plaintiff was shackled and he hit his right upper eye and caused a knot on his forehead for which he received six stitches at Anson hospital. Upon Plaintiff's return from Anson Hospital after the March 8 incident, Defendant Hatley put Plaintiff in a suicide cell for five days without blood pressure medication. Dr. Hayes never saw Plaintiff because Hayes altered his medical record. Hayes stopped Plaintiff's pain medication and Plaintiff broke out in a serious rash on his legs, and his blood pressure was high due to an incident on Anson. Plaintiff appears to allege that, after his hip replacement surgery, Nurse William reduced his pain medication without a doctor's approval.

Plaintiff alleges that Defendants Ingram and Krantz subjected him to violence on March 8,

2017, in retaliation for his comment about officers not being at their posts. After Plaintiff returned from Anson Hospital following the March 8 incident, Defendant Hatley retaliated by placing Plaintiff in a suicide cell for five days without blood pressure medication, property, or legal mail. Defendants Ingram, Laur, and McFauld retaliated against Plaintiff by informing inmates about Plaintiff's crime, which resulted in him having to be placed in a holding cage which, in turn, inflicted emotional distress. After Plaintiff was scheduled for hip surgery on October 21, 2017, Defendant Swink retaliated by intentionally violating his due process classification assignment because Plaintiff had written a grievance complaining about interference with mail procedures.

Plaintiff seeks declaratory judgment, injunctive relief, compensatory and punitive damages, court costs, attorney's fees, a jury trial, and any additional relief that the Court deems just, proper and equitable.

**(2)** **Defendants' Motion for Summary Judgment** (Doc. No. 71)

Defendants Beaver, Deese, Hatley, Herring, Ingram, Krantz, Laur, McFaulds, Swink, and Williams seek summary judgment. They accept the facts as set forth in the Court's Order on initial review of the Amended Complaint, (Doc. No. 18).

Defendants argue that "Nurse William" is not a proper defendant to this lawsuit because no such defendant was named in the caption of the Amended Complaint or was served or waived service, and Disciplinary Hearing Officer A. Williams was dismissed in the Order on initial review. Defendants argue that Defendant Swink should be granted summary judgment because Plaintiff failed to exhaust his administrative remedies as to the retaliation claim against Swink.

With regards to Plaintiff's claims of excessive force, Defendants argue that Laur and Ingram should be granted summary judgment because there is no evidence to support the subjective component of the excessive force inquiry. The allegation that Defendant Ingram took

away Plaintiff's cane and pushed him to his bed are insufficient because, when a lockdown is underway and an inmate is refusing to obey orders, is aggressive and combative and is being restrained, it is standard procedure to take away anything like a cane that could be used as a weapon. With regards to pushing, nothing in the Amended Complaint suggests that pushing Plaintiff to the bed was excessive. Staff are trained to place an inmate on a flat surface, which the bed is, and it would also cushion any fall. There is no allegation that Plaintiff hit the bedframe or was otherwise injured as a result of being placed on the bed. With regards to staff letting Plaintiff go while he was shackled, resulting in a laceration over his eye, this allegation is insufficient to state a claim against any Defendant. Plaintiff does not specify which staff member let him fall or explain when and where this incident occurred and the allegation amounts to simple negligence and not the knowing disregard of a serious risk of injury.

With regards to Laur, the Defendants who were in Plaintiff's cell declare that they did not see any use of force other than minimal hands-on techniques to control Plaintiff, nor did they observe any sign that Plaintiff defected himself. No knot on Plaintiff's head or any other injury is mentioned in the medical notes from March 8, 2017 other than the laceration over his eye that was mentioned and treated, and the evidence reveals that the laceration occurred after Plaintiff was escorted to Richmond Unit. There is no evidence other than Plaintiff's statements that there was an injury, defecation, or hitting. Plaintiff's allegations do not make sense in light of the evidence and he has not set forth more than a scintilla of evidence, which does not create a genuine dispute of material fact. If there was no use of excessive force by Laur, Defendant Ingram cannot be liable for failure to intervene. The only potential allegation of excessive force is Laur's alleged strike to Plaintiff's head which, according to the allegations, would have been quick and Ingram would not have had a reasonable opportunity to intervene.

With regards to Plaintiff's claims of deliberate indifference to a serious medical need, the claims against Defendants Deese, Herring, and Beaver should be dismissed because the need for a wheelchair is not obvious to a lay person. Plaintiff did not have a medical order for a wheelchair and, on February 27, 2017 during the time of the alleged deprivation, Plaintiff returned from an uneventful orthopedic appointment with no new orders. Plaintiff was voluntarily provided with a wheelchair on March 22, 2017. Plaintiff was transferred to Marion C.I., and during the whole time he was housed there, he was not provided a cane or wheelchair. Plaintiff cannot establish that he had a serious medical need for a wheelchair at that time and there is no forecast evidence for the subjective element, *i.e.*, that Herring and Beaver knew of a serious medical condition and ignored it. Nor is there any constitutional violation for taking a broken wheelchair away from Plaintiff.

Plaintiff alleges that Defendant Hatley was deliberately indifferent for placing Plaintiff in a suicide cell for five days without blood pressure medication, this allegedly occurred on March 8, 2017 at 11:50PM, however, Hatley's hours were 8:00 to 17:00 and he would not have been at work at 23:50 hours that day. Dr. Bowman ordered that Plaintiff be placed on self-injurious behavior ("SIB") precautions at 19:25 on March 8 before Plaintiff was sent to Anson. Only medical staff can administer and withhold medications. Correctional staff such as Defendant Hatley has no role regarding the administration of medication.

Plaintiff alleges that Defendants Ingram and Krantz were deliberately indifferent by escorting Plaintiff to segregation on March 8, 2017 without a wheelchair or cane. Plaintiff did not have a medical order at that time and therefore did not have a serious medical need for one at that time. Plaintiff alleges that his hip gave out on him in Richmond Unit. However, the altercation and escort began around 15:30 but Plaintiff was not seen for an eye laceration until 20:20. There is thus no evidence of a serious medical need and no evidence that Defendants Ingram and Krantz

knew of, and disregarded, such a need.

With regards to Plaintiff's claims of retaliation, Defendant Hatley was not responsible for any decision to place Plaintiff in a cell with a camera or for the administration of medication. The retaliation claims against Defendants Ingram, Lauer, and McFaulds are not specific enough. Plaintiff alleges that these Defendants informed other inmates about Plaintiff's crime. However, he fails to describe the convictions for which he is incarcerated or explain how that would place him in danger from other inmates. Nor does he say when he was placed in a Richmond holding cage or how long he remained there such that it caused emotional distress. Records show that Plaintiff was in a holding cell on March 8, 2017 because of an altercation with staff. When he returned from Anson Medical Center, he was placed in Anson Unit and remained there until he was transferred to Marion C.I. in May. Because Plaintiff was placed in Richmond because of an altercation, he cannot show that his placement in a holding cage was the result of retaliation because Defendants told other inmates about his crime. Even if he could prove causation, his conclusory allegations of emotional distress after a short stay in a Richmond holding cage does not support his claim. To the extent Plaintiff was suicidal, he states in a grievance that this was because he received bad news about his mother after she was in a car crash.

The claims of retaliation against Defendant Swink are unexhausted and, in any event, there is no forecast evidence to support this claim. Defendant Swink was an RDU director; he had nothing to do with the mail and had no reason to retaliate because Plaintiff filed a grievance about mail. The RDU program has its own step-downs and is not affected by the filing of any grievance. Therefore, even if the retaliation claim against Swink was not unexhausted, it should be dismissed because it is vague, conclusory, and unsupported.

Defendants further argue that their official capacity claims are barred by sovereign

immunity and that they are entitled to qualified immunity for the claims against them in their individual capacities because they did not violate any clearly established right.

**(3)**    **Plaintiff's Response** (Doc. No. 83)

Plaintiff contends that Defendants' Motion for Summary Judgment should be denied because he has evidence showing that there is ongoing retaliation with incoming and outgoing mail, that he was assaulted, and that deliberate indifference, cruel and unusual punishment, and mail tampering are occurring. He also appears to allege that there has been a change in the incident report and that his due process rights are being violated.

**(4)**    **Evidence**[4]

**(A)**    **Declaration of Kenneth Beaver** (Doc. No. 73-1)

Defendant Beaver was Assistant Superintendent of Custody/Operations at Lanesboro between October 2012 and May 8, 2017. Beaver was responsible for overseeing all staff and inmates in his supervisory chain of command to ensure compliance with departmental policies and procedures.

Plaintiff alleges that Defendant Deese took away his wheelchair and that Defendants Herring and Beaver allowed that to happen when Plaintiff returned from an appointment with an outside orthopedic physician. As correctional staff, Beaver would have not been able to, nor would he have ordered that a medically required wheelchair be taken away from Plaintiff. Beaver "ha[s] no recollection of [Plaintiff's] wheelchair being taken away from him, and [has] no recollection of ordering or 'allowing' Correctional Officer Deese to do so." (Doc. No. 73-1 at 2).

**(B)**    **Declaration of Alan Deese** (Doc. No. 73-2)

Defendant Deese was a Correctional Officer at Lanesboro in March 2017. Defendant Deese

---

[4] This section is not exhaustive.

"was unaware that [Plaintiff] had a doctor's order that he necessarily be provided with a wheelchair" and it is Deese's understanding that on February 13, 2017, Plaintiff "did not have a doctor's order requiring the use of a wheelchair." (Doc. No. 73-2 at 1). Deese did provide the wheelchair that Plaintiff was using to another inmate who overdosed. However, the wheelchair was not operating properly and it was Deese's understanding that another wheelchair had been ordered for Plaintiff's use. It is Deese's recollection that Plaintiff had a cane and that he was able to walk with the cane without putting himself in danger.

**(C)**     <u>**Declaration of Kimberly D. Grande**</u> (Doc. No. 73-3)

Grande is the Executive Director of NCDPS Inmate Grievance Resolution Board ("IGRB"). IGRB is a separate agency within the Division of Adult Correction of the NCDPS. Its examiners are charged with investigation of inmate grievances pursuant to the procedures established by the Administrative Remedy Procedure ("ARP"). ARP establishes a three-tier review process with IGRB appeal being the final step. Exhaustion is not complete until the IGRB completes Step-3 review of the grievance appeal and an order is issued by IGRB.

Grande examined the IGRB records for all Step-3 grievance appeals filed by Plaintiff between June 1, 2015 and November 6, 2018. During this time, IGRB issued 11 orders in response to Step-3 appeals submitted by Plaintiff. Three of the grievance orders were originated or concerning Marion C.I. <u>See</u> (Doc. No. 73-4 at 1-4; 73-5 at 1-4, 73-6 at 1-11).

**(D)**     <u>**Declaration of David Hatley**</u> (Doc. No. 73-7)

Defendant Hatley was the Unit Manager of Anson Unit at Lanesboro in March 2017. He is familiar with DPS policies and procedures, and Lanesboro SOP regarding use of force and medical care for inmates.

Defendant Hatley's hours as Unit Manager were Monday-Friday 08:00 to 17:00. He "can

confirm that [he] was not on duty when [Plaintiff] returned from Anson. Therefore, [he] could not have ordered [Plaintiff] to be placed in a cell with a camera." (Doc. No. 73-7 at 2). "[I]n this case, mental health staff ordered [Plaintiff] to be housed in a cell with a camera because he was on the highest level of Self-Injurious Behavior precautions." (Doc. No. 73-7 at 2).

Plaintiff alleges that Defendant Hatley withheld blood pressure medication or ordered that it not be administered. "Custodial staff has no control over the administration of medication. Nurses administer medication at the direction of a physician. If the medication was not administered it was done at the direction of medical staff. [Hatley] did not have anything to do with the administration of medication to [Plaintiff]; nor did [Hatley] order or direct the medical staff not to administer medication. [Hatley] did not otherwise retaliate against [Plaintiff]." (Doc. No. 73-7 at 2).

### (E)    **Declaration of John Herring** (Doc. No. 73-8)

In March 2017, Defendant Herring was Superintendent of Lanesboro C.I. Herring is familiar with NCDPS policies and procedures, and Lanesboro SOP re use of force, conditions of confinement and programs provided at the facility.

Plaintiff alleges that Defendant Herring allowing Defendant Deese to take Plaintiff's wheelchair away on February 17, 2017. However, "[u]ntil Plaintiff filed this lawsuit, [Herring] had no knowledge or memory whatsoever of Plaintiff's wheelchair being taken away." (Doc. No. 73-8 at 2).

With respect to the necessity of use of a wheelchair is a medical issue, and as correctional staff neither Herring nor any of his correctional staff would have controlled the process relating to the prescription, ordering or requiring the use of a wheelchair. Herring aware that some inmates are provided with a wheelchair even if it is not required, ordered or prescribed by the medical staff,

but the provision of the wheelchair in that instance is voluntary and for the convenience of the inmate. Regardless, in February and March of 2017 Herring "had no knowledge of Officer Deese taking away Plaintiff's wheelchair." (Doc. No. 73-8 at 2).

Herring does not remember having a discussion with Plaintiff or interacting with him. As administrator, Herring did review the incident report of the March 8, 2017 incident and reviewed video of the incident that is being provided to the Court. See (Doc. No. 73-9).

    **(F)**    **Declaration of Kevin Ingram** (Doc. No. 73-10)

In March 2017, Defendant Ingram was Unit Manager of Union Unit at Lanesboro. As such, he is familiar with DPS policies and procedures and Lanesboro SOP re use of force.

On March 8, 2017, at approximately 15:10, Ingram was called for a lockdown in A-Pod of Union Unit. Lockdown is when the inmates must leave the common area and go to their cells which are then locked. After the lockdown was announced Plaintiff became "loud and aggressive and did not immediately go to his cell." (Doc. No. 73-10 at 2). Plaintiff was given several orders to submit to restraints, but he refused and retreated to his cell. In the cell, Ingram saw Plaintiff "backswing his right hand at Officer Laur." (Id.). Ingram then used both hands to assist Plaintiff onto his bunk. This was pursuant to staff training to gain control of an inmate by placing the inmate against a flat surface such as a wall or the floor. In this case, the bed was used as a flat surface. The bed did have a mattress on it. Ingram "took [Plaintiff's] cane away since it could be used as a weapon." (Id.). It is standard procedure when attempting to disarm an inmate and take anything that could be used as a weapon. Officer Laur and other staff used hands-on techniques to control Plaintiff while Ingram placed restraints on him. Plaintiff was then escorted to restrictive housing without further incident. "Neither [Ingram] nor any other staff used any force other than the hands-on force necessary to maintain control of [Plaintiff]. [They] did not hit him, kick him or shove him

to the ground forcefully." (Id.).

Ingram is aware that Plaintiff alleges that in some of his versions of events that he hit his head on the bedframe cutting his head and requiring stitches. "That is not true. [Plaintiff] did not hit his head on the bedframe. He was not cut or bleeding when he left his cell." (Doc. No. 73-10 at 3). Ingram is also aware that in one of his versions of events Plaintiff claims that staff let go of Plaintiff while he was shackled and he fell and hit his head causing the cut. "[Plaintiff] did not fall and cut his head while [Ingram] was in his cell or at any time that [Ingram] observed." (Id.). Ingram is also aware that Plaintiff says he defecated on himself. Ingram "did not observe or smell anything to suggest that he had defecated on himself in his cell." (Id.) "The minimal hands-on force that we used was necessary for the custodial goal of restraining [Plaintiff]." (Id.). Ingram is also aware that Plaintiff alleges that Ingram took away his cane and he later fell because of it. "[Plaintiff's] cane was taken away for security reasons." (Id.). In addition, Plaintiff could not have used a cane while he was in full restraints, but while he was in full restraints he would have been escorted by two officers, one on each side, to assist him in walking.

**(G)** **Declaration of Jeffrey Krantz** (Doc. No. 73-11)

Defendant Krantz was a Correctional Sergeant at Lanesboro C.I. in March 2017. He is aware that Plaintiff is making claims of deliberate indifference and retaliation against him.

On March 8, 2017, Krantz was conducting a pat-down in Moore Unit when he was called to the A-Pod of Union Unit. When Krantz got there, he saw Plaintiff in his cell resisting being placed in restraints. Krantz assisted in getting Plaintiff under control so that complaints could be applied. Krantz did not see any use of force other than minimal force using hands-on techniques in order to control Plaintiff. Once Plaintiff was in full restraints Krantz helped Officer Snipes escort Plaintiff to restrictive housing. Plaintiff was in full restraints while they escorted him which

hampered his walking. But Plaintiff attempted to pull away from us and at times refused to walk. He was given several orders to stop resisting and keep walking. When they got near central control, Krantz was relieved of escort duties and returned to his unit.

Officers Krantz and Snipes did not "let go" of Plaintiff at any time while Krantz was escorting him. (Doc. No. 73-11 at 2). Plaintiff did try to pull away several times, but each time Officers Snipes and Krantz regained control and placed our hands on his elbows to support and guide him. Plaintiff did not fall and cut his head while Krantz was in his cell or while Krantz was escorting him. While Krantz was escorting Plaintiff, "he did not have a cut on his forehead." (Id.). "[Plaintiff] was able to walk without his cane. Although his walk was hampered by the full restraints, and at times he walked slowly, [Krantz] did not notice any limping or unsteady gait." (Id.).

Krantz "did not retaliate against [Plaintiff]." (Id.). Krantz was not even assigned to Anson Unit. At that time, Krantz was assigned to Moore Unit. Krantz had no reason to retaliate against Plaintiff. Krantz simply assisted in maintaining control until Plaintiff was restrained and began escorting him to restrictive housing. All of that was "ordinary and according to policy." (Doc. No. 73-11 at 3).

**(H)**     **Declaration of Scott McFaulds** (Doc. No. 73-12)

Defendant McFaulds was the Assistant Unit Manager at Lanesboro C.I. as of April 2015. In March 2017, he was the Unit Manager of Anson Unit. Defendant McFaulds is familiar with DPS policies and procedures, and Lanesboro SOP regarding use of force.

Defendant McFaulds does not know why he is a Defendant in this case. His recollection of events relating to Plaintiff are that Plaintiff got into an altercation on the Union Unit which is located on the other side of the facility from where McFaulds was assigned. After the altercation,

the offender was taken to the Richmond Unit, which is still across the hall from Anson Unit, McFauld's assigned section, and was placed in a holding cage. McFaulds does remember going to the Richmond Unit and seeing him in the cage but that was the only time McFaulds had seen him. According to the computer records, Plaintiff was transported to the hospital for treatment on March 8, 2017. Upon Plaintiff's return from Anson Medical Center on March 9, 2017, at approximately 0031 hours, Plaintiff was placed on McFaulds' unit, Anson Unit, in an observation cell after he commented to staff that he was going to hang himself. Plaintiff remained in McFaulds' unit, Anson, in Restricted Housing for Control Purposes ("RHCP") until he was transferred to Marion Correctional Facility in May 2017. RHCP is the most restrictive housing level in North Carolina state prisons. It is essentially what used to be called isolation.

With regards to the allegation that Ingram, Laur and McFaulds informed inmates about Plaintiff's "Crime," McFaulds did not know what Plaintiff was in prison for until McFaulds had to do research for this case. The fact that Defendants Ingram and Laur worked on a different unit than McFaulds is contradicting in itself. If the "Crime" was filing a grievance, McFaulds did not tell any inmates about his grievance. McFaulds does not even remember Plaintiff filing a grievance. Even if he had, that would not have caused any reaction from the prisoners at all. McFaulds simply did not do anything that was not according to the policies and procedures of DPS and Lanesboro.

  **(I)**    <u>**Declaration of Gregory Swink**</u> (Doc. No. 73-13)

Defendant Swink became Program Director II at Marion C.I. in March 2016 and held that position in Spring 2017. Plaintiff assaulted staff on March 8, 2017. As a result, Plaintiff was placed on RHCP on April 5, 2017, to protect staff and other inmates at Lanesboro C.I. The assignment to RHCP was one of the qualifications for transfer to Marion Correctional Unit and entry into the

RDU program.

Swink and his staff routinely review inmates in RHCP for their qualification for the RDU program. There are a number of items that are looked at with regard to selection. It is a group decision which includes the inmate's file being reviewed for conflicts with other inmates and review of the inmate's file by the psychological staff. RDU is not a voluntary program. It is a step-down assignment from RHCP. In other words, it helps the inmate get off RHCP and back to the general population. The inmate can control his status by completing certain tasks and remaining infraction free.

Pursuant to classification policy C0102.1(c), offenders assigned to RDU shall not require a classification review until program completion. However, if the inmate successfully meets certain standards, the inmate receives more privileges and less controlled incarceration. If the inmate successfully completes the entire program, they go off control altogether and can be released into general population.

Plaintiff was transferred to Marion for the RDU Program on May 25, 2017. After transfer to Marion, Plaintiff was removed from control status and assigned to the RDU Program that same day.

Defendant Swink "did not interfere with [Plaintiff's] rights or progress while he was here or in selecting him for the program because he filed a grievance regarding the mail." (Doc. No. 73-13 at 3). Swink was not even aware that Plaintiff filed a grievance relating to the mail. The RDU program has nothing to do with delivery or sending of mail, so Swink did not and would not care if Plaintiff filed a grievance dealing with the mail. There was no reason for Swink to do anything affecting Plaintiff's due process classification. Swink "[is] not entirely sure exactly what [Plaintiff] is complaining about when he alleges that [Swink] retaliated by interfering with his 'due

process' in prison. As indicated above, the RDU program has its own mileposts for step-downs. The filing of a grievance would not have affected his progress. To the extent that [Plaintiff] did not progress as quickly as others, it was because he had two infractions during his time in the RDU program … [for] Sexual Act; and Threaten to Harm Staff. [Plaintiff] pled guilty to the sexual act infraction and the threat to harm staff infraction. Those infractions, and especially the threat to harm staff would have held him back from a 'step-down' – meaning he would not have gained certain privileges as quickly as other inmates who did not have infractions or who had minor infractions." (Doc. No. 73-13 at 3).

During the time that Plaintiff was housed at Marion, he was able to walk without a cane or wheelchair, although he did request and receive special shoes. (Doc. No. 17-13 at 3).

Plaintiff graduated from the RDU Program on October 9, 2018 and would have gone back to the general population. Unfortunately, it appears that he received an infraction for fighting with another inmate since he graduated, and Swink does not know what Plaintiff's current status is.

**(J)**     **Declaration of Dena West** (Doc. No. 17-14)

Dena West is a board certified registered nurse and was Nurse Supervisor II at Lanesboro as of January 2017. West is familiar with NCDPS policy and procedure and Lanesboro SOP, and specifically, Health Services Policy and Procedure Manual. Her responsibilities include: "medication administration, providing clinical oversight to the nursing staff at Lanesboro, providing oversight to the daily operations of the nursing staff at Lanesboro, reviewing and relying upon patient medical records, including patient charts and notes made by nurses and supervising nursing staff in delivering care as directed by orders of physicians, physician extenders, and nurse practitioners, and assisting in other capacities as needed." (Doc. No. 73-14 at 2). West reviewed Plaintiff's medical records, which are kept in the course of regularly conducted business and bases

her declaration in part on those records.

Based on West's experience and training: "the Correctional Staff[5] are not health care providers and were not, at any relevant time, responsible for personally providing clinical care to inmates at Lanesboro including their medication and medical treatment. They were also not responsible for the clinical supervision of any health care providers at the facility. Non-medical correctional officials such as Correctional Staff are only allowed limited information regarding an inmate's health pursuant to the Health Insurance Portability and Accountability Act. Further, the Correctional Staff would not have any training regarding the appropriate medical treatment for patients nor would they have had the ability to control or alter a plan of care concerning any patient's medical care." (Doc. No. 73-14 at 3).

From reviewing Plaintiff's medical records from February to March 2017, "it does not appear that he had a medical order for a wheelchair. Nonetheless, he was voluntarily provided one on March 22, 2017. (Id.).

With regards to the March 8, 2017 incident, Plaintiff was examined by a nurse at the prison medical facility at approximately 20:20 that day. Plaintiff presented with a cut over his left eye which he said happened when he fell in a holding cage. (Doc. No. 73-14 at 4). "The nurse did not record or note any other injuries and she specifically did not report an injury to the right side of his head." (Id.). Plaintiff was given first aid then sent to the Emergency Department of Anson Medical Center for stitches.

"[T]he Correctional Staff are not responsible for the health care – including mental health care of the inmates." (Id.). Dr. Marvella Bowan, a psychologist in Lanesboro C.I., ordered that Plaintiff be put on Level 1 SIB precautions and that he be placed in a cell with a camera at 19:25

---

[5] Herring, Beaver, Deese, and Hatley are "Correctional Staff." (Doc. No. 73-14 at 3).

on March 8 – before he was sent to Anson Medical Center. That order for Level-1 SIB precautions is noted in the clinical encounter after his return to Lanesboro after being seen at Anson Medical Center.

"[C]orrectional staff at Lanesboro had no involvement with the administration of medication. Correctional staff was not allowed to intervene or interfere with the administration of medication. Correctional staff could not prohibit the administration of medication to the inmates." (Id.). Nurses are the ones administering the medication and West trains them to report directly and immediately to West if correctional staff interferes with the healthcare of the inmates, including administration of medication. Prescriptions for medications are strictly controlled by physicians and physician-extenders. Nurses under West's supervision do not deviate from the physicians' orders regarding medication. "Mr. Hatley did not, and could not have interfered with the administration of medication – regardless of where [Plaintiff] was housed." (Doc. No. 73-14 at 5). In addition to the policy, West reviewed Plaintiff's medical records and has seen "no indication that Mr. Hatley interfered with the administration of medicine to [Plaintiff]." (Id.).

    **(K)**    **Time Line**

2/27/17    <u>Clinical Encounter – Administrative Note</u> by Nurse Janet Truong: "1300-IM has returned from ortho apt, he has no new orders. He reports that his trip to the doctor apt was uneventful. He became upset and agitated and extremely hostile and yelling when I told that w/c's are on back order and he would have to use his cane to walk back to his unit…." (Doc. No. 73-15 at 1)

3/8/17    <u>Incident Report</u> for use of force incident (Doc. No. 73-9)

        <u>Clinical Encounter – Administrative Note</u> by Nurse Sandra Gregory: "Offender presented in main medical with a 4 cm horizontal laceration above lateral aspect of L eyebrow. 0.5 cm in width at center of laceration. **Offender states his hip gave out and he fell in the holding cell**. Provider notified and telephone order rec'd to send to local ED via state car for eval." (Doc. No. 73-17 at 1) (emphasis added)

3/9/17    <u>Clinical Encounter – Administrative Note</u> by Nurse Gregory: "Offender returned from Anson ED with 6 sutures intact over lateral aspect of L eyebrow. Per telephone

report from ED nurse, sutures are to be removed in 5-10 days. **Per mental health, offender is level 1 SIB** and will be housed in a camera cell in the Anson unit." (emphasis added)

3/11/17    <u>Emergency Grievance</u> (4865-2017-NPODC-00534) by Plaintiff: "On 3-8-17, while housed on Union A-47, two (2) staff members entered A-pod, yelling, 'Lock Down!' I hung up the phone and a staff member yelled at me and I stated, 'If y'all keep an officer on post, these incidents wouldn't happen.' As I entered my cell <A-47>, both of the staff members entered behind me and one of them tried to cuff me from behind. Due to the fact that I walk with a cane and use a wheelchair, I loss my balance and the other officer punched me in my temple with a closed fist. Afterwards I was escorted to Anson Unit and placed in a holding cage. As I sat in the holding cage, **I tried to commit suicide** because I had just received bad news from home concerning my folks. Staff came and stopped me then moved me to a holding cage on lower Richmond Unit. **I tried to stand up and my hip gave out on me and I fell and burst my left eye**. Staff left me lying on the floor for a long period of time without notifying medical, until the blood dried up and I became conscious. Afterwards, I was taken to Medical checked by the Nurse and given a shower because I defecated on myself during the use of force. Later I was taken to Anson Co Hospital and I received six (6) stitches…." (Doc. No. 73-18 at 2-3) (emphasis added).

3/22/17    <u>Clinical Encounter – Administrative Note</u> by Nurse Amba Totou: "Wheel Chair issued to patient at this time." (Doc. No. 73-16 at 1).

5/25/17    <u>Transfer</u> to Marion C.I.'s RDU (Doc. No. 73-13)

### III.    LEGAL STANDARDS

**(1)**    **Summary Judgment**

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fec. R. Civ. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). A fact is material only if it might affect the outcome of the suit under governing law. <u>Id.</u>

The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the

absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal citations omitted). Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Id. at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. Id. at 324. The nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248; accord Sylvia Dev. Corp. v. Calvert County, Md., 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. Anderson, 477 U.S. at 255. "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" Ricci v. DeStefano, 557 U.S. 557, 586 (2009) (quoting Matsushita v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

**(2)**    **Exhaustion**

The Prison Litigation Reform Act ("PLRA") requires a prisoner to exhaust his administrative remedies before filing a section 1983 action. 42 U.S.C. § 1997e(a). The PLRA provides, in pertinent part: "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." Id. The PLRA's exhaustion requirement applies to all inmate suits about prison life. Porter v. Nussle, 534 U.S. 516 (2002). Exhaustion is mandatory. Id. at 524 (citation omitted); Jones v. Bock, 549 U.S. 199, 211 (2007). Exhaustion must take place before the commencement of the civil action in order to further the efficient administration of justice. Id. A prisoner is not entitled to exhaust

administrative remedies during the pendency of an action. <u>Cannon v. Washington</u>, 418 F.3d 714, 719 (7th Cir. 2005); <u>Freeman v. Francis</u>, 196 F.3d 641, 645 (6th Cir. 1999). The PLRA requires "proper" exhaustion, that is, "using all steps that the agency holds out, and doing so <u>properly</u> (so that the agency addresses the issues on the merits).'" <u>Woodford v. Ngo</u>, 548 U.S. 81, 90 (2006) (quoting <u>Pozo v. McCaughtry</u>, 286 F.3d 1022, 1024 (7th Cir. 2002)).

"The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." <u>Jones</u>, 549 U.S. at 218. It is well settled that a grievance does not have to mention a defendant by name so long as the grievance gives the defendant fair notice of the claim. <u>See</u> <u>Moore v. Bennette</u>, 517 F.3d 717, 729 (4th Cir. 2008). However, regardless of whether a particular defendant is named in a grievance, if the grievance fails to give prison authorities fair notice of, and the opportunity to address, the problem that will later form the basis of the suit against that defendant, dismissal of that defendant is appropriate. <u>See</u> <u>Davidson v. Davis</u>, 2015 WL 996629 at *3 (W.D.N.C. Mar. 6, 2015) (citing <u>Johnson v. Johnson</u>, 385 F.3d 503, 516-17 (5th Cir. 2004)).

NCDPS policy has a three-step administrative remedy procedure that requires an inmate to complete all three steps in order to fully exhaust a grievance.[6]

**(3)**    <u>**Excessive Force**</u>

"[T]he treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment," <u>Helling v. McKinney</u>, 509 U.S. 25, 31 (1993). In its prohibition of "cruel and unusual punishments," the Eighth Amendment places restraints on prison officials, who may not, for example, use excessive physical force against

---

[6] The Court takes judicial notice of this portion of NCDPS's Policy and Procedures as a matter of public record. <u>See</u> Fed. R. Ev. 201.

prisoners. <u>See</u> <u>Hudson v. McMillian</u>, 503 U.S. 1, 1 (1992).

A prison official violates the Eighth Amendment only when two requirements are met. First, the deprivation alleged must be, objectively, "sufficiently serious," <u>Wilson v. Seiter</u>, 501 U.S. 294, 298 (1991); <u>see also</u> <u>Hudson</u>, 503 U.S. at 5, and must result in the denial of "the minimal civilized measure of life's necessities," <u>Rhodes v. Chapman</u>, 452 U.S. 337, 347 (1981). The second requirement is that a prison official must have a "sufficiently culpable state of mind." <u>Wilson</u>, 501 U.S. at 297, 302-03; <u>Hudson</u>, 503 U.S. at 5, 8. "[T]he use of excessive physical force against a prisoner may constitute cruel and unusual punishment [even] when the inmate does not suffer serious injury." <u>Hudson</u>, 503 U.S. 1, 4 (1992); <u>see</u> <u>Wilkins v. Gaddy</u>, 559 U.S. 34, 34 (2010). The "core judicial inquiry," is not whether a certain quantum of injury was sustained, but rather "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." <u>Hudson</u>, 503 U.S. at 7. "When prison officials maliciously and sadistically use force to cause harm," the Court recognized, "contemporary standards of decency always are violated ... whether or not significant injury is evident. Otherwise, the Eighth Amendment would permit any physical punishment, no matter how diabolic or inhuman, inflicting less than some arbitrary quantity of injury." <u>Hudson</u>, 503 U.S. at 9, 13–14.

The Fourth Circuit addresses a failure to intervene claim as a theory of "bystander liability" wherein there is "an omission to act...coupled with a duty to act." <u>Randall v. Prince George's Cnty.</u>, 302 F.3d 188, 202 (4th Cir. 2002). A "bystander officer" could be liable for his or her nonfeasance if he or she: "(1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act." <u>Id.</u> at 204. However, if no excessive force is applied by the fellow officer, the officer witnessing the conduct "cannot be held liable under bystander liability for a failure to intervene." <u>Howie v. Prince George's Cnty.</u>,

2009 WL 2426018 at *6 (D. Md. Aug. 5, 2009); <u>see also</u> <u>Jarvis v. Securitas Sec. Servs. USA</u>, 2012 WL 527597 (D. Md. Feb. 16, 2012).

**(4)**     **Deliberate Indifference to a Serious Medical Need**

"[T]he Eighth Amendment's prohibition against 'cruel and unusual punishments' [extends] to the treatment of prisoners by prison officials" and "forbids the unnecessary and wanton infliction of pain," <u>Hill v. Crum</u>, 727 F.3d 312, 317 (4th Cir. 2013) (internal quotations omitted).

Prisoners alleging that they have been subjected to unconstitutional conditions of confinement must satisfy the Supreme Court's two-pronged test set forth in <u>Farmer v. Brennan,</u> 511 U.S. 825, 832 (1994). <u>See</u> <u>Scinto v. Stansberry</u>, 841 F.3d 219, 225 (4th Cir. 2016). The plaintiff must show that he had serious medical needs, which is an objective inquiry, and that the defendant acted with deliberate indifference to those needs, which is a subjective inquiry. <u>See</u> <u>Iko v. Shreve</u>, 535 F.3d 225, 241 (4th Cir. 2008). In order to be sufficiently serious, the deprivation must pose "a serious or significant physical or emotional injury resulting from the challenged conditions," or "a substantial risk of such serious harm resulting from ... exposure to the challenged conditions." <u>De'Lonta v. Angelone</u>, 330 F.3d 630, 634 (4th Cir. 2003) (internal quotation marks and citation omitted). To constitute deliberate indifferent to a serious medical need, "the treatment [a prisoner receives] must be so grossly incompetent, inadequate, or excessive to shock the conscience or to be intolerable to fundamental fairness." <u>Miltier v. Beorn</u>, 896 F.2d 848, 851 (4th Cir. 1990), *overruled on other grounds by* <u>Farmer</u>, 511 U.S. at 825. Negligence or malpractice does not violate the Eighth Amendment. <u>Miltier</u>, 896 F.2d at 852. Further, "mere '[d]isagreements between an inmate and a physician over the inmate's proper medical care' are not actionable absent exceptional circumstances." <u>Scinto</u>, 841 F.3d at 225 (quoting <u>Wright v. Collins</u>, 766 F.2d 841, 840 (4th Cir. 1985)).

**(5)** **Retaliation**

Prison officials may not retaliate against an inmate for exercising a constitutional right. See Hudspeth v. Figgins, 584 F.2d 1345, 1347 (4th Cir.1978). To succeed on such a claim, a plaintiff must first allege that "the retaliatory act was taken in response to the exercise of a constitutionally protected right...." Adams v. Rice, 40 F.3d 72, 75 (4th Cir. 1994). Thereafter, a plaintiff must demonstrate that he suffered some adverse impact or actual injury. See American Civil Libs. Un. of Md., Inc. v. Wicomico Cnty., 999 F.2d 780, 785 (4th Cir. 1993) (citing Huang v. Board of Governors of Univ. of N.C., 902 F.2d 1134, 1140 (4th Cir. 1990)). In addition, a plaintiff must come forward with specific evidence "establish[ing] that but for the retaliatory motive the complained of incident[s] ... would not have occurred." Woods v. Smith, 60 F.3d 1161, 1166 (5th Cir. 1995); accord Ponchik v. Bogan, 929 F.2d 419, 420 (8th Cir.1991) (plaintiff must show that action would not have occurred "but for" the alleged reprisal); Collinson v. Gott, 895 F.2d 994, 1002 (4th Cir. 1990) (Phillips, J., concurring); McDonald v. Hall, 610 F.2d 16, 18–19 (1st Cir.1979). In the prison context, such claims are treated with skepticism because "[e]very act of discipline by prison officials is by definition 'retaliatory' in the sense that it responds directly to prisoner misconduct." Adams, 40 F.3d at 74.

**(6)** **Sovereign Immunity**

The Eleventh Amendment bars suits directly against a state or its agencies, unless the state has waived its immunity or Congress has exercised its power under § 5 of the Fourteenth Amendment to override that immunity. Will v. Michigan Dep't of State Police, 491 U.S. 58, 66 (1989). Congress has not imposed § 1983 liability upon states, and the state of North Carolina has done nothing to waive its immunity. Bright v. McClure, 865 F.2d 623, 626 (4th Cir. 1989) (citing McConnell v. Adams, 829 F.2d 1319, 1328 (4th Cir. 1987)).

"[A]n official capacity suit is, in all respects other than name, to be treated as a suit against the entity." Kentucky v. Graham, 473 U.S. 159, 166 (1985). Therefore, a lawsuit against an officer in his official capacity is, in substance, a claim against the governmental entity and should be subject to the same analysis. See Almone v. City of Long Beach, 478 F.3d 100, 106 (2d Cir. 2007); see Hutto v. S.C. Retirement Sys., 773 F.3d 536, 549 (4ᵗʰ Cir. 2014) (State officials sued in their official capacities for retrospective money damages have the same sovereign immunity accorded to the State).

**(7)** **Qualified Immunity**

The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Qualified immunity "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Pearson v. Callahan, 555 U.S. 223, 231 (2009). The existence of qualified immunity "generally turns on the 'objective reasonableness' of the actions" without regard to the knowledge or subjective intent of the particular official. Am. Civil Libs. Union of Md., Inc., 999 F.2d at 784 (quoting Anderson v. Creighton, 483 U.S. 635, 639, 641 (1987)) (internal citations omitted).

In Saucier v. Katz, 533 U.S. 194 (2001), the Supreme Court mandated a two-step sequence for resolving government officials' qualified immunity claims by determining whether: (1) the facts that a plaintiff has alleged or shown make out a violation of a constitutional right; and (2) the right at issue was "clearly established" at the time of defendant's alleged misconduct. While the sequence of the steps set forth in Saucier is "often appropriate," it is not mandatory. Pearson, 555

U.S. at 236. Judges are permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand. Id.

To overcome the qualified immunity defense at the summary judgment stage, the plaintiff must have shown facts that make out a violation of a constitutional right, and the right at issue must have been "clearly established" at the time of the defendant's alleged misconduct. Thompson v. Commonweath of Va., 878 F.3d 89, 97 (4th Cir. 2017) (citing Pearson, 555 U.S. at 232). The analysis takes place against the backdrop of two dueling interests: "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Pearson, 555 U.S. at 231.

To find a right is clearly established does not mean that "the exact conduct at issue [must] have been held unlawful for the law governing an officer's actions to be clearly established." Amaechi v. West, 237 F.3d 356, 362 (4th Cir. 2001). Rather, the court's analysis must take into consideration "not only already specifically adjudicated rights, but those manifestly included within more general applications of the core constitutional principle invoked." Id. at 362-63 (internal quotation omitted). Ordinarily, the unlawfulness of government conduct must be apparent in light of pre-existing law. White v. Pauly, 137 S.Ct. 548, 442 (2017). However, a "general constitutional rule … may apply with obvious clarity ... even though the very action in question has not previously been held unlawful. Hope v. Pelzer, 536 U.S. 730, 741 (2002) (citing United States v. Lanier, 520 U.S. 259, 271 (1997)). Therefore, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." Id. at 741.

## IV.    DISCUSSION

**(1)    <u>Defendant Willams</u>**

Defendants argue that "Nurse William" is not captioned as a party to this lawsuit, has not been served or waived service, that DHO Alfred Williams was dismissed in the initial review, and that no other Defendant Williams appears in this case. Plaintiff does not attempt to refute any of the foregoing and Defendants' Motion for Summary Judgment will be granted as to Defendant Williams.

**(2)    <u>Defendant Swink</u>**

Defendants argue that Plaintiff failed to exhaust his administrative remedies with regards to his claim against Defendant Swink because he never completed the third step of the grievance process. <u>See</u> (Doc. No. 73-3) (Grande Declaration). Plaintiff has not come forward with evidence proving that he exhausted his administrative remedies with regards to Defendant Swink. Therefore, summary judgment in favor of Defendant Swink will be granted for lack of exhaustion.

**(3)    <u>Excessive Force</u>**

Plaintiff claims that Defendants Laur and Ingram used excessive force against him and/or failed to intervene with regards to the March 8 incident, that Defendant Ingram threw or took Plaintiff's cane and pushed Plaintiff onto his bed, that Laur hit Plaintiff so hard on the temple that Plaintiff defecated himself and had a "knot" on Plaintiff's forehead, and that "staff" let go of him while he was shackled which caused him to hit his right upper eye that required stitches. (Doc. No. 15-1 at 5).

Defendants have presented evidence that Ingram took away Plaintiff's cane during the confrontation pursuant to standard procedure because a cane could be used as a weapon in the hands of a non-complying and aggressive inmate. A videotape of the dayroom confirms that

Plaintiff was swinging his cane around in the air as he walked towards his cell. Defendants also presented evidence that Plaintiff struck Defendant Laur's face while he was resisting and that Defendant Ingram used both hands to place Plaintiff against a flat surface – Plaintiff's bed – to gain control of him pursuant to staff training. Taking a potential weapon away from a resisting and uncooperative prisoner and placing him against a cushioned flat surface to regain control and compliance fail to rise to the Eighth Amendment level of force. Plaintiff has failed to demonstrate that a genuine dispute of material fact exists with regards to these actions by Defendant Ingram.

With regards to Plaintiff's claim that Defendant Laur struck him hard on the temple, Defendant Ingram also denies that he, Laur, or any of his staff hit, kicked, or shoved Plaintiff to the ground forcefully, but rather, that the minimal hands-on force that officers used was necessary to restrain Plaintiff. Defendant Krantz's affidavit also states that he did not see any use of force other than minimal hands-on techniques and assisted in escorting Plaintiff to restrictive housing. (Doc. No. 73-11 at 2). However, there is no videotape from inside the Plaintiff's cell and no affidavit by Defendant Laur has been filed. Plaintiff and Defendants have presented conflicting evidence about whether Defendant Laur struck Plaintiff on the temple inside the cell. The existence of this genuine dispute of material fact precludes summary judgment for Defendant Laur on Plaintiff's claim of excessive force. However, Plaintiff has failed to demonstrate a genuine dispute of material fact with regards to Defendant Ingram's alleged failure to intervene in Laur's use of force. In his affidavit, Ingram denies that any hitting occurred. Plaintiff has failed to come forward with any evidence that Ingram saw and had a reasonable opportunity to prevent Laur's single strike to Plaintiff's head, and chose not to act. See, e.g., N.C. ex rel. Hailey v. Westmoreland, 267 F. Supp. 2d 497, 502 (M.D.N.C. 2003) (granting summary judgment for defendant officer who did not have a reasonable opportunity to prevent harm to the plaintiff where another officer's act in

striking the plaintiff occurred, if it all, without warning and in a very brief time period); Dukes v. Richards, 2009 WL 9056101 (E.D.N.C. Aug. 27, 2009) (granting summary judgment where the record indicated that, even if the defendant officer was standing next to the plaintiff during the alleged incident, the defendant officer would not have had a reasonable opportunity to prevent another officer's sudden decision to kick the plaintiff). Therefore, although the excessive force claim against Defendant Laur survives summary judgment, any failure to intervene by Defendant Ingram does not.

Plaintiff's allegations that staff allowed him to fall, causing a laceration, are refuted by objective evidence as well as by Plaintiff's own grievance. Nurse's notes and surveillance video of Plaintiff's escort to segregation reveal that Plaintiff did not have a facial laceration after the incident in his cell and that staff did not let go and allow him to fall during the escort. Plaintiff's own grievance that he filed a few days after the incident states that he fell and lacerated his face while trying to stand up in a holding cell on Richmond Unit following his suicide attempt. (Doc. No. 73-18 at 3). Plaintiff has failed to create a genuine dispute of material fact about whether staff let go of him and caused the laceration to his head and Defendants will be granted summary judgment on that portion of the excessive force claim.

Therefore, all Defendants will be granted summary judgment on Plaintiff's claims of excessive force and failure to intervene except Defendant Laur, for whom summary judgment will be denied on the claim of excessive force.

**(4)**     <u>**Deliberate Indifference to a Serious Medical Need**</u>

Plaintiff claims that Defendants Herring, Beaver, and Deese were deliberately indifferent to a serious medical need by depriving him of a wheelchair and failing to promptly replace his wheelchair after it broke, that Defendants Ingram and Krantz escorted Plaintiff to segregation

without a wheelchair or cane with his hands cuffed behind him while knowing his wrist had been injured in 2013 and his hip gave out as a result, and that Defendant Hatley placed Plaintiff in a suicide cell for five days without blood pressure medication.

Defendants have presented evidence that Plaintiff did not have a medical order for a wheelchair at the relevant time, but that inmates are sometimes provided with a wheelchair by correctional staff as a courtesy. Plaintiff has failed to establish that he had a serious medical need for a wheelchair or that the Defendant correctional officers, who are not medical personnel, were deliberately indifferent by failing to provide a courtesy wheelchair during the entire period when he wished for one. Plaintiff has also failed to establish that a wrist injury in 2013 was a serious medical need in March 2017 that precluded handcuffing behind his back, and that the Defendant correctional officers knowingly disregarded a serious risk of harm by cuffing him behind his back. To the extent that Plaintiff complains that he was deprived of a cane, Defendants have submitted evidence demonstrating that Plaintiff's cane was taken during a security incident because Plaintiff was acting aggressively and was not complying with officers. Further, Defendants' evidence shows that Plaintiff was escorted to segregation by two officers who helped support him. Video surveillance evidence confirms that two officers escorted Plaintiff and that Plaintiff had no limp or other sign of difficulty in walking with the officers without a cane or wheelchair. Plaintiff's contention that his hip gave out as a result of the escort is refuted by the videotapes, officer declarations, and Plaintiff's own grievance which stated that his hip gave out and he fell while he was in a cage following his suicide attempt. Finally, Defendants have presented evidence that Defendant Hatley could not have been deliberately indifferent for Plaintiff's placement in a suicide cell for five days without medication because Hatley was not working when Plaintiff was placed on suicide watch, because correctional officers lack the authority and ability to interfere with

medication, and that SIB status was ordered by a staff psychologist.

Plaintiff has failed to come forward with evidence to establish that a genuine dispute of material fact exists on the issue of deliberate indifference and, therefore, summary judgment will be granted in favor of Defendants on his deliberate indifference claims.

**(5)**     <u>**Retaliation**</u>

Plaintiff alleges that Defendants Ingram and Krantz subjected him to violence on March 8, 2017 in retaliation for telling officers that they should have had officers at their posts, that Defendant Hatley retaliated against Plaintiff by placing him in a suicide cell for five days, that Defendants Ingram, Laur, and McFaulds retaliated against Plaintiff by informing inmates about Plaintiff's crime, and that Defendant Swink intentionally violated Plaintiff's due process classification assignment in retaliation for Plaintiff's grievance complaining about interference with the mail.

With regards to Plaintiff's claim of retaliation by Ingram and Krantz, Defendants presented evidence that their use of force on March 8 was reasonable and in response to Plaintiff's aggressive and non-complying behavior. Plaintiff has failed to come forward with any evidence that Ingram and Krantz violated his constitutional rights and that retaliation was not a but-for cause of their use of force. <u>See</u> Section (3), *supra*; <u>Woods</u>, 60 F.3d at 1166 (requiring but-for causation for retaliation claims). With regards to suicide watch, Defendants have presented evidence that Defendant Hatley had nothing to do with Plaintiff's placement on suicide watch and that a psychologist ordered SIB status due to Plaintiff's suicide attempt and not because of anything to do with Defendant Hatley. <u>See</u> Section (4), *supra*. Plaintiff's claim that Defendants Ingram, Laur, and McFaulds retaliated by informing other inmates about Plaintiff's "crime" is too vague and conclusory to establish retaliation. Plaintiff has not demonstrated the existence of a genuine dispute of material fact that

retaliation occurred. With regards to classification, even if the claims against Defendant Swink were exhausted, Defendant Swink would be entitled to summary judgment because Defendants have presented evidence that Defendant's classification was dictated by the Plaintiff's progress in the RDU program and was not individually determined by Swink, that Swink was unaware of Plaintiff's grievance about the mail and, even if he had been aware, it would not have made any difference in Plaintiff's classification.

Plaintiff has failed to present evidence that creates a genuine dispute of material fact on any of the foregoing and, accordingly, Defendants will be granted summary judgment on Plaintiff's retaliation claims.

**(6)**     **<u>Sovereign Immunity</u>**

Plaintiff's claims for damages against Defendants in their official capacities are barred by sovereign immunity. <u>See</u> <u>Almone</u>, 478 F.3d at 106; <u>Hutto</u>, 773 F.3d at 549. Therefore, Defendants' Motion for Summary Judgment for damages will be granted on that basis.

**(7)**     **<u>Qualified Immunity</u>**

Defendants argue that qualified immunity shields them from damages in their individual capacities because Plaintiff has not established a clearly established violation of law. With respect to the use of force, Plaintiff has failed to show that Defendant Ingram's use of force against an aggressive and non-complying inmate was prohibited by clearly established law. Nor has he shown that officers were required to provide Plaintiff with a wheelchair or handcuff him in front of his body despite the lack of a serious medical need, or that any retaliation occurred. Therefore all Defendants are entitled to qualified immunity except Defendant Laur on the claim of excessive force.

**IV.     PENDING MOTION**

Plaintiff has filed a Motion to Alter or Amend the Order granting Defendant Hayes' Motion for Summary Judgment. (Doc. No. 66). He argues, *inter alia*, that Hayes' Motion should have been denied because a bone specialist said Plaintiff needed a left hip replacement, Hayes overlooked the bone specialist's orders that Plaintiff not be housed upstairs, that Plaintiff was placed in fear of bodily injury, stalking, and harassment, and that Plaintiff never got to see Defendant Hayes about the recommended hip replacement. Plaintiff argues that the prison system's chief medical officer can be liable for failing to correct the failures of medical tracking that resulted in surgery in October 2017 that was approved in 2010 and 2015 by a bone specialist.

Defendant Hayes has filed a Response in opposition to Plaintiff's Motion, (Doc. No. 78), arguing that the deadline for appealing or to file a motion to alter or amend has expired under Rule 59(e) of the Federal Rules of Civil Procedure and Rule 4(a) of the Federal Rules of Appellate Procedure. The latest day Plaintiff could have requested an extension of time to appeal under Rule 4 would have been August 22, 2019, and he failed to do so.

Plaintiff does not dispute Defendant Hayes' arguments that his Motion was untimely filed pursuant to Rules 4 and 59, and he does not attempt to demonstrate excusable neglect or good cause, or any other exception to the applicable time limits. Therefore, Plaintiff's Motion to Alter or Amend will be denied.

To the extent that Plaintiff seeks additional relief, *i.e.*, stay of docket entries 14, 54, 55, 56, and 60, and striking docket entries 62 and 63, the Motion will be denied because Plaintiff has stated absolutely no reason why any such relief should be granted.

## V.     CONCLUSION

Based on the foregoing, Defendants' Motion for Summary Judgment is granted in part and denied in part, Plaintiff's Motion to Alter or Amend is denied, and the case will proceed to trial on

Plaintiff's claim of excessive force against Defendant Laur in his individual capacity.

**IT IS, THEREFORE, ORDERED** that:

1. Defendants' Motion for Summary Judgment, (Doc. No. 71), is **GRANTED** in part and **DENIED** in part as stated in this Order.

2. Plaintiff's "Motion to Alter Amend the Judgment & Deposition Before Action or Pending Appeal & Rule 27 Motion to Strike [Doc. 62-63] Motion to Stay [Doc. 14, Doc. 42, Doc. 55-56, 60," (Doc. No. 66), is **DENIED**.

3. This case will be set for trial on the excessive force claims against Defendant Laur in his individual capacity in a separate order.

Signed: January 14, 2020

Frank D. Whitney
Chief United States District Judge